## A08A0640. MACKAY v. THE STATE.
### (662 SE2d 814)

BERNES, Judge.

Following a jury trial, Brian Scott Mackay appeals his conviction for trafficking in methamphetamine. In his sole allegation of error, Mackay contends the trial court erred in denying his motion to suppress evidence obtained by law enforcement officers as a result of a warrantless entry into his home. For the reasons that follow, we affirm.

> In considering an appeal from denial of a motion to suppress, this Court construes the evidence in favor of the trial court's ruling, and we review de novo the trial court's application of the law to undisputed facts. Additionally, we must defer to the trial court's determination on the credibility of witnesses, and the trial court's ruling on disputed facts must be accepted unless it is clearly erroneous.

(Citation omitted.) *Lindsey v. State*, 287 Ga. App. 412 (651 SE2d 531) (2007). When making our decision, we consider all evidence of record, including evidence introduced at trial. Id.

So viewed, the evidence showed that in September 2003, Catoosa County Animal Control Officer Chris Clark was summoned to the residence of a woman complaining of three rottweiler dogs that had entered her pen and were killing her goats. When Clark arrived at the complainant's residence, she informed him that the dogs were "highly aggressive," so much so that she was afraid to leave her home. The complainant also expressed serious concern for the welfare of a group of seven to nine children, including her grandchild, who were due to exit a school bus near the residence at "any minute."

Clark retrieved a shotgun and walked around the side of the house in an effort to obtain a view of the dogs. As he approached the goat pen, one of the rottweilers suddenly charged at him. The dog's haunches were up, its head was down, and it was "fixed on his target" — Clark. When the dog lunged at Clark, he shot and killed the animal. Clark then saw a second rottweiler biting a goat that the rottweiler had pinned down on the ground. The goat was kicking and thrashing and bleeding profusely from its shoulder area. Clark tried

YALE LAW LIBRARY

to startle the dog into freeing the goat by screaming, but was unsuccessful. He then shot and killed the second dog. Moments later, Clark observed the third rottweiler jump the fence and run across the road to a neighboring lot, where it entered the open front door of a mobile home. Once Clark determined that no one in the home was screaming for help, he summoned for backup assistance. Clark was unable to determine at that time who owned the dogs.

Fearing the impending arrival of the school bus, Clark stood in the general area of the bus stop as he waited for his backup to arrive. As he did so, he watched the mobile home intently. He did not see the dog exit the mobile home.

Clark's backup, Deputy Freddie Roden, arrived approximately ten to twelve minutes later. After the two men conferred and agreed that the unleashed dog presented a significant threat to the public, they determined that it had to be captured and contained until they could identify its owner. The wind had blown the door of the mobile home partially closed but it was not secured. Deputy Roden knocked loudly on the door as well as a window and identified himself, but received no response. The men then pushed open the door, where they immediately saw the dog sitting under a kitchen table. They also observed in plain view drug paraphernalia and other items that Deputy Roden recognized to be consistent with the manufacturing of illicit drugs. Clark retrieved the dog using a linear pole and the men exited the mobile home.

As they were exiting, Deputy Roden summoned his supervisor and a narcotics detective to the scene. Mackay's wife then arrived and approached the residence. She admitted that she lived in the home with Mackay and that the dogs belonged to them. After being informed of her *Miranda* rights, she consented both verbally and in writing to a search of the residence. The search produced a large quantity of ephedrine, acetone, muriatic acid, camp fuel, red devil lye, and stained coffee filters, in addition to various other apparatuses, all of which are items collectively associated with the clandestine manufacture of methamphetamine. Mackay later gave a statement in which he admitted to both manufacturing and using methamphetamine.

Mackay moved to suppress all tangible evidence, photographs, and testimony resulting from law enforcement's entry into his home. He argued that the officer's initial entry into the trailer was unlawful and vitiated the subsequent consent obtained from Mackay's wife. The trial court denied Mackay's motion, based upon its finding that an exigency justified the officers' initial entry into the home.

It is true, as argued by Mackay, that the Fourth Amendment generally prohibits law enforcement officers from entering a home

without the homeowner's consent, in the absence of a warrant allowing them to do so. See *Illinois v. Rodriguez*, 497 U. S. 177, 181 (II) (110 SC 2793, 111 LE2d 148) (1990); *State v. Randolph*, 278 Ga. 614 (604 SE2d 835) (2004). Evidence seized after an illegal entry is generally inadmissible. OCGA § 17-5-30 (a) (1). As recognized by the trial court, however, "[a]n exception to the warrant requirement exists . . . where the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." (Citation and punctuation omitted.) *Love v. State*, 290 Ga. App. 486, 487 (659 SE2d 835) (2008). An exigent circumstance is one "when an officer reasonably believes that a warrantless entry is a necessary response on his part to an emergency situation." (Citation, punctuation and footnote omitted.) *Jackson v. State*, 280 Ga. App. 716, 718 (1) (634 SE2d 846) (2006). The issue of exigency is a question of fact to be determined by the trial court and we will accept the court's finding if there is any evidence to support it. Id.

Here, there was evidence supporting the trial court's determination. The officers entered Mackay's home in pursuit of a vicious dog that had been terrorizing the complainant and killing her goats. The dog was one of a pack of "highly aggressive" rottweilers. Clark was nearly attacked by one of the dogs when he arrived on the scene. The officers feared for the safety of the imminently arriving school children to the extent they had decided to forbid the children from exiting the school bus until the dog had been caught. They did not know who owned the dog, nor did they know whether the dog posed a threat to anyone or anything inside of the mobile home or to anyone that might return to the mobile home. Based upon his experience as an animal control officer, Clark believed that the dog constituted "a threat to society."

Faced with these facts, the trial court did not err in concluding that an exigency existed and that the officers "enter[ed] in response to what they reasonably perceive[d] as an emergency involving a threat to life or property." *Love*, 290 Ga. App. at 488. See also *Lindsey v. State*, 247 Ga. App. 166, 168 (1) (543 SE2d 117) (2000); *State v. Brannan*, 222 Ga. App. 372, 373-374 (1) (474 SE2d 267) (1996); *Coker v. State*, 164 Ga. App. 493, 496-497 (5) (297 SE2d 68) (1982). It follows that the trial court's denial of Mackay's motion to suppress was proper.[1]

*Judgment affirmed. Ruffin, P. J., and Andrews, J., concur.*

---

[1] Mackay does not otherwise assert error with respect to the consent to search given by his wife.

DECIDED MAY 30, 2008.

*Brian M. House*, for appellant.

*Herbert E. Franklin, Jr., District Attorney, Bruce E. Roberts, Assistant District Attorney*, for appellee.